IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  24-1117

_____

JOSEPH BUSHRA

*Plaintiff/Appellant*

v.

MAIN LINE HEALTH, INC.

*Defendant/Appellee*

_____

# APPELLEE'S BRIEF
_____

*On appeal from the United States District Court
for the Eastern District of Pennsylvania
Honorable Harvey Bartle III, Civil Action No. 23-cv-1090*

_____

Caren Litvin, Esq. (ID No. 41796)
Litvin Law Office
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
Brendan Hennessy, Esq. (ID No. 91831)
*Of Counsel to Litvin Law Office*
*Attorneys for Appellee, Main Line Health, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Appellate Rule 26.1.1, Appellee, Main Line Health, Inc., states that it is a Pennsylvania non-profit with no parent company. There is no publicly-held company that owns ten percent or more of its stock. There is no publicly held corporation which is not a party to this proceeding which has a financial interest in the outcome of the proceeding.

Dated: April 16, 2024

*/s/Caren Litvin*
Caren Litvin

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF CITATIONS ................................................................................ iii

COUNTER-STATEMENT OF ISSUES ................................................................. 1

COUNTERSTATEMENT OF RELATED CASES ................................................... 1

COUNTERSTATEMENT OF THE CASE ............................................................. 2

    A.  Impact of COVID-19 on Health Care Systems ............................................ 2
    B.  Vaccination was critical tool in protecting Patients and Staff ..................... 3
    C.  MLH COVID-19 Vaccination Policy ........................................................ 4
    D.  Dr. Bushra's request for an exemption to Vaccination Policy ................... 5
    E.  Denial of Appellant's Exemption Request and Appeal .............................. 6
    F.  Procedural History ................................................................................. 7

STANDARD OF REVIEW ............................................................................... 7

SUMMARY OF ARGUMENT ........................................................................... 9

LEGAL ARGUMENT .................................................................................... 10

I.   This Court should affirm the Order of the District Court because allowing an emergency room physician to work unvaccinated treating vulnerable patients would impose an undue burden on the Hospital's efforts to protect patients and staff in the midst of the COVID pandemic. ......................................................... 10

II.  The District Court properly determined that Appellant failed to demonstrate that he was subject to disparate treatment based on his religion. ........................ 17

III.   The District Court correctly determined that Appellant failed to establish a retaliation claim. ...................................................................................... 21

IV.   CONCLUSION ...................................................................................... 25

COMBINED CERTIFICATIONS ...................................................................... 27

Certificate of Bar Membership ....................................................................... 27

CERTIFICATE OF ELECTRONIC SERVICE ...................................................... 28

# TABLE OF CITATIONS

## CASES

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) .............................8

*Antredu v. Massachusetts Dep't of Youth Servs.*, No. CV 22-12016-WGY, 2024 WL 1539725 (D. Mass. Apr. 9, 2024)(.............................16

*Aubrecht v. Pennsylvania State Police*, 389 F. App'x 189 (3d Cir. 2010)...............8

*Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3d Cir. 1993) .............................8

*Brown v. J. Kaz, Inc*., 581 F.3d 175 (3d Cir.2009) .............................10

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).................24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).............................8

*Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668 (E.D. Pa. 2022) ...........4

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021).............................12

*E.E.O.C. v. GEO Group, Inc*., 616 F.3d 265 (3d Cir. 2010) .................................12

*EEOC v. North Memorial Health Care*, 908 F.3d 1098 (8th Cir. 2018).................22

*Elizabeth Bushra v. Main Line Health, Inc*. No. CV 23-1031, 2024 WL 1219962 (E.D. Pa. Mar. 21, 2024).............................2

*Fallon v. Mercy Catholic Med. Ctr.*, 877 F.3d 487 (3d Cir. 2017) .........................20

*Groff v. DeJoy*, 600 U.S. 447 (2023) .............................11, 12, 16, 25

*Mimi Ma v. Westinghouse Elec. Co., LLC*, 559 F. App'x 165 (3d Cir. 2014)........21

*Moore v. City of Philadelphia*, 461 F.3d 331 (3d Cir. 2006) .................................21

*Orsatti v. N.J. State Police*, 71 F.3d 480 (3d Cir. 1995) .............................8

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) ...........................11, 12

*Watson v. Eastman Kodak Co.*, 235 F.3d 851 (3d Cir. 2000) ...................................7

*White v. Gallagher Bassett Servs.*, 257 F. Supp. 2d 804 (E.D. Pa. 2003)...............18

**STATUTES**

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 *et seq.* ..............7, 10

Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e-2(a) *et seq.*passim

**RULES**

Fed. R. Civ. P. 56(c) ...............................................................................................8

Fed. R. Evid. 801(c). ...........................................................................................18

Fed. R. Evid. 802 .................................................................................................18

L.A.R. 28.3(c) .......................................................................................................8

## COUNTER-STATEMENT OF ISSUES

1.      Whether the District Court's entry of summary judgment was appropriate on Dr. Bushra's religious discrimination claim where Main Line Health demonstrated that allowing an unvaccinated emergency room physician to provide direct patient care would cause an undue hardship on Main Line Health's efforts to protect patients and staff in the midst of the COVID pandemic?

Suggested Answer: Yes.

2.      Was the District Court's entry of summary judgment appropriate on Dr. Bushra's religious discrimination claim based on its finding that Appellant failed to establish sufficient comparator evidence to support a disparate treatment claim?

Suggested Answer: Yes.

3.      Was the District Court's entry of summary judgment appropriate on Dr. Bushra's retaliation claim because Appellant did not engage in protected activity or establish retaliatory conduct?

Suggested Answer: Yes.

## COUNTERSTATEMENT OF RELATED CASES

Appellant's Brief referenced the lawsuit filed by Appellant's wife, Dr. Elizabeth Bushra, which had been pending in the Eastern District. On March 21, 2024, the Honorable Wendy Beetlestone granted summary judgment to Main Line

Health, Inc., dismissing that case in its entirety. *Elizabeth Bushra v. Main Line Health, Inc*. No. CV 23-1031, 2024 WL 1219962, at *5 (E.D. Pa. Mar. 21, 2024).

## COUNTERSTATEMENT OF THE CASE

### A.     Impact of COVID-19 on Health Care Systems

In March 2020, COVID-19 plunged the world into a global pandemic that has claimed the lives of over a million Americans to date. (Appx232).   Appellee, Main Line Health (MLH), and other health care institutions were on the front lines of caring for patients suffering from COVID and other illnesses. Hospitals struggled to keep up with patient demand.  (Appx619).  Facilities delayed routine and non-emergency procedures in order to free up capacity to address heath care needs related to COVID-19.  (Appx619).

Appellant, Dr. Joseph Bushra, was an Emergency Room doctor at Lankenau Medical Center, one of four acute care hospitals in the MLH system.  (Appx149). Dr. Bushra was not employed by Main Line Health, but rather, was an owner of Main Line Emergency Medicine Associates LLC ("MLEMA"), a physician group contracted to provide emergency room services to MLH hospitals. (Appx152-154, 228, 699). In order to treat patients at Lankenau, Dr. Bushra was required to be a member of the Main Line Health medical staff.  (Appx150).

Dr. Bushra treated vulnerable patients in the emergency department, some of whom died from COVID.  (Appx233).   COVID's death toll was not limited to

patients. More than 3600 health care workers died of COVID-19 in the first year of the pandemic, including Main Line Health employees. (Appx618-819; Appx233). Illness, death and burnout amongst health care workers further strained the ability of hospitals to provide patient care. (Appx619).

**B.    Vaccination was critical tool in protecting Patients and Staff**

When COVID vaccines became available in December 2020, the government prioritized health care workers for vaccination because:

1. Health care workers were at increased risk of contracting and transmitting COVID-19;

2. Medical personnel were in regular contact with persons at increased risk of serious complications and death from COVID, including persons who were immunocompromised, had comorbidities and/or were elderly;

3. Reducing the risk of health care personnel contracting COVID was a local, state and national priority in order to maintain health care capacity; and

4. Given the sacrifice health care personnel were making to care for COVID patients and others, it was equitable for them to receive all means available to protect themselves from the disease.

(Appx234, 619-620). Based on the demonstrated efficacy of the Moderna, Pfizer and J&J COVID-19 vaccines in preventing disease and reducing transmission,

unvaccinated persons were at increased risk of contracting and transmitting COVID-19. (Appx621-622, 628).

In addition to vaccination, health care institutions relied on alternative infection control strategies such as masking, testing and social distancing. (Appx631). Each of these strategies, however, had limitations and the most effective policy to control COVID-19 in health care settings was a comprehensive approach which combined all of these infection control strategies. (Appx631). Indeed, public health authorities recommended the use of multiple interventions concurrently in order to reduce the spread of COVID:

> To minimize the spread of COVID-19, public health authorities including the CDC and the MCOPH recommend masking in indoor public spaces, alongside other preventive measures. The CDC explained that "[m]ask use and layered prevention strategies, such as receiving all recommended vaccination and booster doses, physical distancing, screening testing, and improved ventilation, are key to preventing COVID-19 and decreasing transmission." . . . According to the CDC, "[n]o one strategy is sufficient to prevent transmission, and multiple interventions should be used concurrently to reduce the spread of disease."

*Doe 1 v. Perkiomen Valley Sch. Dist*., 585 F. Supp. 3d 668, 691-692 (E.D. Pa. 2022).

### C.    MLH COVID-19 Vaccination Policy

In the summer of 2021, the Delta variant of COVID, which was more transmissible and contagious than prior strains, was gaining traction. (Appx237). On July 15, 2021, Main Line Health adopted a COVID-19 Vaccination Policy with the explicit purpose "[t]o protect patients, employees, students, volunteers, and

members of the Medical Staff from COVID-19 infection through vaccination."
(Appx664). The Vaccination Policy allowed exemptions for medical conditions or
sincerely held religious beliefs that precluded vaccination. (Appx665-666).

### D. Dr. Bushra's request for an exemption to Vaccination Policy

Dr. Bushra contracted COVID in June of 2021 and believed that his risk of
reinfection was very low. (Appx243, 279). The Centers for Disease Control and
Prevention ("CDC"), however, recommended that "[t]o reduce their likelihood for
future infection, all eligible persons should be offered COVID-19 vaccine, even
those with previous SARS-CoV-2 infection." (Appx622). In September 2021, Dr.
Bushra asked the President of the Medical Staff, Dr. Emma Simpson, to create an
exception to the COVID Vaccination Policy for medical staff members who had
recovered from COVID. (Appx248-249, 257-260, 670-672). Dr. Simpson responded
that the only way to obtain an exemption from the COVID vaccination Policy is to
apply for a medical or religious exemption. (Appx671). Dr. Bushra told Lankenau's
President, Phil Robinson, that it would be a "good business move" to offer temporary
exemptions to individuals who had contracted COVID. (Appx339-340).

Despite Dr. Bushra's efforts, the COVID Vaccination Policy did not carve out
an exception for individuals who previously had COVID. Dr. Bushra then requested
a religious exemption to the Policy, which stated "I follow a Christian worldview"

which "prohibits me from actions that put myself or others at unnecessary risk of harm." (Appx681). Dr. Bushra raised four objections to the COVID vaccine:

(1) "It is my sincerely-held belief that my receiving a vaccine developed using fetal cells would signify my approval of the unethical means used to develop it, which I cannot do while remaining true to my faith."

(2) "Having already recovered from COVID-19 infection, I am statistically at extremely low risk of reinfection or death from COVID-19" and "[u]ntil it is clear that the benefit of COVID-19 vaccination outweighs the risks to me, I would violate my sincerely-held religious beliefs to take those risks."

(3) "COVID-19 vaccines are currently in quite short supply worldwide" and "[t]here are hundreds of millions of individuals around the world who are at higher risk of death from COVID-19 thatn I am, and for whom the benefit of vaccination may be greater than the potential benefit to me."

(4) "Finally, and most importantly, my Christian worldview requires me to act in accordance with my conscience; to violate my conscience is a sin. This teaching is explicit in Christian scriptures and is recognized by the First Amendment to the Constitution."

(Appx681). Dr. Bushra's submission included his Pastor's letter which referenced only the last objection, that it would violate his "conscience." (Appx682).

### E. Denial of Appellant's Exemption Request and Appeal

The MLH Religious Exemption Committee reviewed Dr. Bushra's exemption request and determined that it failed to reflect sincerely held religious beliefs that precluded COVID vaccination. (Appx358). Dr. Bushra appealed the denial, after which the Appeals Committee, the Medical Staff Credentials Committee and a subcommittee of the Medical Executive Committee reviewed his exemption request

and concluded that he failed to state a sincerely held religious belief that prohibited vaccination. (Appx357, 696-697, 716-719). Dr. Bushra, like all members of the medical staff who failed to obtain the COVID-19 vaccine or an approved exemption, was placed on administrative suspension on November 15, 2021. (Appx751).

### F. Procedural History

On March 20, 2023, Dr. Bushra filed a federal court action against Main Line Health, Inc., alleging that Defendant subjected him to religious discrimination and retaliation in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e-2(a) *et seq*. and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 *et seq*. (Appx028). On December 28, 2023, the Honorable Harvey Bartle III granted Main Line Health's Motion for Summary Judgment and dismissed Dr. Bushra's Complaint in its entirety. (Appx003-0024). On January 18, 2024, Dr. Bushra filed a Notice of Appeal. (Appx001-002). On March 18, 2024, Dr. Bushra filed his Appellant's Brief, to which Main Line Health now responds.

### STANDARD OF REVIEW

An appellate court's review of a district court's grant of summary judgment is plenary. *See Watson v. Eastman Kodak Co*., 235 F.3d 851, 854 (3d Cir. 2000). The appellate court must determine whether the record, when viewed in a light favorable to the appellant, shows that there is no genuine issue of material fact, and that appellee was entitled to summary judgment. *See, e.g., Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986). Summary judgment is appropriate where, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986). The moving party need only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, *supra*, 477 U.S. at 323.. The burden then shifts to the non-moving party to point to specific evidence -- as opposed to mere allegations, general denials, or vague statements -- establishing a genuine issue for trial. *Id*. at 324; *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993). If the non-moving party fails to make such a showing, summary judgment must be entered against it. *Celotex*, *supra*, 477 U.S. at 322-23. To defeat a motion for summary judgment, a party must "point to concrete evidence" in the record; unsupported assertions, conclusory allegations or mere suspicions cannot overcome a motion for summary judgment. *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). The same standard applies on appeal: "All assertions of fact in briefs must be supported by a specific reference to the record." *L.A.R. 28.3(c)*; *see Aubrecht v. Pennsylvania State Police*, 389 F. App'x 189, 193 (3d Cir. 2010) (dismissing appeal for failure to meaningfully engage relevant legal authority).

## SUMMARY OF ARGUMENT

The Court should affirm the District Court's entry of summary judgment for Main Line Health for three reasons:

First, the District Court correctly found that allowing Dr. Bushra to work unvaccinated treating vulnerable patients would have imposed an undue hardship on Main Line Health's efforts to protect patients, staff and their families during the COVID pandemic. Main Line Health provided expert analysis demonstrating that healthcare workers were more likely to contract COVID-19 than others due to workplace exposure and that vaccines were highly effective in preventing disease. Relying on that expert analysis, the District Court determined that unvaccinated, Dr. Bushra risked infecting and even causing the death of staff members and vulnerable patients which would severely impair the Hospital's mission of treating the sick and injured. Dr. Bushra offered no expert or evidence to dispute the expert's analysis.

Second, the District Court correctly determined that Dr. Bushra failed to demonstrate that he was subject to disparate treatment as he did not produce any admissible evidence that Main Line Health treated Roman Catholics more favorably that members of the Tenth Presbyterian Church.

Third, the District Court correctly determined that Dr. Bushra could not demonstrate a Title VII retaliation claim based on his contention that he engaged in "protected activity" by applying for a religious exemption. Merely requesting a

religious accommodation is not "protected activity." Moreover, the alleged retaliation complained of by Dr. Bushra entail petty slights that do not constitute unlawful retaliation.

## LEGAL ARGUMENT

I.  **This Court should affirm the Order of the District Court because allowing an emergency room physician to work unvaccinated treating vulnerable patients would impose an undue burden on the Hospital's efforts to protect patients and staff in the midst of the COVID pandemic.**

In 2021, Main Line Health (MLH) and other healthcare institutions across the country adopted COVID-19 Vaccination Policies to protect patients, staff, and their families. Under the MLH COVID-19 Vaccination Policy, all medical staff and employees were required to be fully vaccinated against COVID by November 1, 2021, unless approved for a medical or religious exemption. Appellant, Dr. Bushra, sought a religious exemption to the Policy, but the Religious Exemption and Appeals Committees denied his exemption request. Appellant contends that he was subject to religious discrimination and retaliation in violation of Title VII and the PHRA. Claims brought under the PHRA are generally "interpreted coextensively with Title VII claims." *Brown v. J. Kaz, Inc*., 581 F.3d 175, 179 n. 1 (3d Cir.2009).

Title VII does not provide every employee requesting a religious accommodation with an absolute right to work unvaccinated. Rather, Title VII requires covered employers to accommodate sincerely held religious beliefs, unless doing so would impose "an undue hardship on the conduct of the employer's

business." *42 U.S.C. §2000e(j)(emphasis added)*. As Title VII fails to define when hardship becomes "undue," the Supreme Court has offered guidance.

The Supreme Court first defined the parameters of "undue hardship" in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977). In that case, an airline worker contended his religious beliefs prevented him from working on the Sabbath, which impacted the union seniority system. The Court held that requiring TWA to bear more than a *de minimis* cost to exempt plaintiff from working Saturdays would constitute an undue burden. *Id*. at 84.

In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court revisited the "undue burden" standard where a postal worker's religious objection to working on Sundays impacted the schedule and morale of co-workers. 600 U.S. at 456, 472. According to the *Groff* Court, "showing 'more than a *de minimis* cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." *Id*. at 468. The Court held that a religious accommodation presents an "undue hardship" when the "accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 471. The Court did not define "substantial increased costs;" rather, "[h]aving clarified the Title VII undue hardship standard," it deemed it "appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance." *Id*. at 473.

In both of the undue hardship cases considered by the Supreme Court, the employees' religious objections prevented them from working weekend shifts, which impacted the schedules of other employees and workplace rules. *Groff, supra*, 600 U.S. at 456, 472; *Hardison*, *supra*, 432 U.S. at 84. Neither of those cases addressed the challenges to health care institutions in the midst of a public health crisis where the motivation for a vaccination policy was not inconvenience to co-workers, but rather, the health and safety of those co-workers, their families, and patients.

This Court has recognized that "[b]oth economic and non-economic costs can impose an undue hardship on employers." *E.E.O.C. v. GEO Group, Inc*., 616 F.3d 265, 273 (3d Cir. 2010). That decision held that "[a] religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship…." *Id*. at 273. *See also Does 1-6 v. Mills*, 16 F.4th 20, 35-36 (1st Cir. 2021)(in denying preliminary injunction to unvaccinated healthcare workers based on, *inter alia*, religious objections to vaccination, court concluded that "hospitals need not provide [a COVID-19 vaccination] exemption ... because doing so would cause them to suffer undue hardship").

In the proceedings below, Main Line Health relied on the expert analysis of Dr. Daniel Salmon, the Director of the Institute for Vaccine Safety and a Professor of Global Disease Epidemiology and Control at Johns Hopkins University.

(Appx615).  According to Dr. Salmon, healthcare workers were more likely to contract COVID-19 than others because they faced significant exposure to the virus through infected patients and other healthcare staff.  (Appx618-619).  Healthcare workers with direct patient contact had four times the risk of contracting COVID-19 compared with healthcare workers without direct patient contact. (Appx618-619).

Because healthcare workers faced such significant infection risk, they were also more likely to transmit the disease. (Appx620). More importantly, healthcare workers were at increased risk of infecting their patients, which included persons at increased risk of serious complications and death from the disease.  (Appx620).  For these reasons, the Centers for Disease Control and Prevention ("CDC") prioritized healthcare workers for COVID-19 inoculation when the vaccines became available. (Appx619-620).

According to Dr. Salmon, COVID vaccines were highly effective in preventing the disease at the time that MLH instituted the mandate.   According to his analysis, "full vaccination with COVID-19 vaccines was 80% effective in preventing COVID-19."  (Appx621).  A CDC study available in August of 2021 indicated that among previously infected persons, reinfection was about twice as high if not fully vaccinated which led the CDC to recommend: "To reduce their likelihood for future infection, all eligible persons should be offered COVID-19 vaccine, even those with previous SARS-CoV-2 infection." (Appx622).

The District Court concluded that it was indisputable that because he was unvaccinated, Dr. Bushra had an increased risk of contracting and transmitting COVID to vulnerable patients and staff, which would have impaired MLH's mission of caring for sick and injured patients:

> It cannot be disputed that without the vaccine, Dr. Bushra was at great risk of contracting and transmitting the disease because he had frequent and direct contact with patients and staff as a doctor in the emergency room. Unvaccinated, Dr. Bushra risked infecting and even causing the death not only of his colleagues and MLH staff but also of vulnerable patients. The ability of MLH to continue its mission of caring for, treating, and healing the sick and injured would have been severely impaired with an unvaccinated Dr. Bushra in its midst. In sum, there can be no doubt that MLH would have incurred undue hardship in the form of substantial social, if not economic, costs if it had been required to accommodate Dr. Bushra's religious beliefs.

(Appx23).

As the Judge Bartle noted, Dr. Bushra did not present a rebuttal expert or offer any evidence to challenge Dr. Salmon's expert report. (Appx023). Rather, Dr. Bushra simply contended that Main Line Health is "disingenuous" to argue undue hardship because it granted the religious accommodation request of a Roman Catholic member of MLH staff. (Appx023). But, as Judge Bartle determined, even if such an accommodation would be relevant to undue hardship, "the only admissible evidence that Dr. Bushra presents as to this alleged religious accommodation is what purports to be the partially-redacted application of the Roman Catholic individual"

and "he made no attempt to obtain further evidence on this subject from MLH." (Appx024).

The record does not include any evidence as to whether the Catholic applicant had direct interactions with any patients, and, if so, whether those patients were immunocompromised, elderly or otherwise vulnerable to COVID infection. Nor did the record reflect the nature of the Catholic worker's practice. Many physicians can reschedule patients suffering from COVID, which is not an option for emergency room doctors treating patients in accute distress. Radiologists analyzing films or practitioners conducting telehealth visits may have limited exposure to patients and staff or the ability to work remotely. Some health care professionals do not treat sick or vulnerable patients, but instead provide routine care to healthy patients.

Dr. Bushra worked in the emergency room where individuals suffering heart attacks, strokes, catastrophic injuries and other trauma sought treatment that could not be rescheduled or handled remotely. Allowing Dr. Bushra to continue treating patients while unvaccinated would expose staff and patients to an increased risk of transmission of COVID. As the undue hardship analysis is a fact-specific inquiry, Appellant cannot simply equate his position with another health care provider, when he failed to develop any record on that other practitioner's position. *See, e.g., Antredu v. Massachusetts Dep't of Youth Servs.*, No. CV 22-12016-WGY, 2024 WL 1539725, at *5 (D. Mass. Apr. 9, 2024)(allowing youth development specialist,

whose close contact with clients would have increased his risk for spreading COVID-19, to work unvaccinated would put his colleagues, clients, and their families at a higher risk for contracting COVID-19 and therefore would impose an undue hardship; Plaintiff failed to demonstrate that the positions of exempted employees performing different duties posed the same burdens on operations).

Judge Bartle concluded that "MLH has established that it would suffer undue hardship, as defined in *Groff*, if it were required to accommodate any sincerely-held religious belief of Dr. Bushra." (Appx024)(*citing*, *Groff*, *supra*, 600 U.S. at 470). As there was "no evidence to the contrary to create a genuine dispute of material fact," the district court properly granted Appellant's motion for summary judgment.

Appellant argues that there is some significance to the fact that Main Line Health did not explicitly raise undue hardship when the Religious Exemption Committee and Appeals Committees denied his request for an exemption from the Vaccination Policy. Appellant cites no precedent for this argument, and the underlining statute does not require an employer to articulate its undue hardship at any particular time—on the contrary, the statute states that an accommodation based on "religion" is not required where an employer establishes "undue hardship." *See 42 USCA § 2000e* (excluding from the definition of "religion" where accommodation of beliefs would constitute an "undue hardship on the conduct of the employer's business.").

Appellant further raises the lower court's unreported and non-precedential decision in *Gray v. Main Line Hosps., Inc.*, No. CV 23-0263, 2024 WL 643140 (E.D. Pa. Feb. 15, 2024)*,* wherein the court declined to grant summary judgment on undue hardship prior to trial. In that case, the district court emphasized that the plaintiff had retained experts to rebut the defendant's expert report relative to undue hardship giving rise to factual issues. *Id.* at *6. Judge Bartle properly decided this case based on the different record facts before the Court, in which Dr. Bushra did not present any expert report analysis or challenge the assertions made by Dr. Salmon.

Main Line Health respectfully asks that the Circuit Court hold that Title VII does not obligate health care providers to grant exemptions to vaccination requirements during a pandemic to health care workers who provide direct patient care, which will provide guidance to lower courts. However, this Court could also affirm on the more narrow grounds based upon the record in this case in which Appellee presented unrebutted evidence of undue hardship.

In short, the record facts before Judge Bartle supported that allowing an emergency room doctor to provide direct patient care would amount to an undue hardship.

## II.     The District Court properly determined that Appellant failed to demonstrate that he was subject to disparate treatment based on his religion.

In order to demonstrate disparate treatment based on his religion, Dr. Bushra must demonstrate that he was "singled out and treated less favorably than others

similarly situated on the basis of" their religious beliefs. *White v. Gallagher Bassett Servs.*, 257 F. Supp. 2d 804, 808 (E.D. Pa. 2003). It is undisputed that MLH's COVID Vaccination Policy applied to all employees and medical staff members and nothing in the Policy or the factual record reflects that individuals with certain religious beliefs were treated differently than others.

Dr. Bushra contends that he "presented evidence that the same exemption request was granted to another physician, requesting the accommodation on the same religious grounds as Appellant, but the only difference being that the other physician's religious denomination was Catholic instead of Tenth Presbyterian." (Appellant's Brief at p. 19). Contrary to such assertion, Judge Bartle determined that Dr. Bushra produced no admissible evidence other than part of an exemption request of a Roman Catholic:

> the only admissible evidence that Dr. Bushra presents as to this alleged religious accommodation is what purports to be the partially-redacted application of the Roman Catholic individual. All other information as to this individual and any accommodation is based on Dr. Bushra's testimony at his deposition. The testimony is inadmissible hearsay. See Fed. R. Evid. 801, 802. It is offered for the truth and based upon what others told him. See Fed. R. Evid. 801(c). He does not have any relevant firsthand knowledge on this subject, and he made no attempt to obtain further evidence on this subject from MLH.

(Appx011).

Dr. Bushra does not explain his assertion that the "same exemption request was granted to another physician . . . on the same religious grounds." (Appellant's

Brief at p. 19).   Individuals who sought religious exemptions to the MLH COVID Vaccination Policy expressed their objections differently (unless they copied exemption letters from the Internet).   Two exemption requests cannot be compared like the attendance violations of two individuals who report to the same supervisor, one of whom was terminated and one of whom was not. MLH relied on its Religious Exemption Committee, which included representatives from pastoral care, human resources and physicians, to review the nuances of each exemption request to determine whether it   articulated a sincerely held religious belief that precluded COVID vaccination.

There are significant differences between Appellant's exemption request and the purported comparator.  Dr. Bushra raised four objections to COVID vaccination: (1) receiving a vaccine that had been developed using fetal cell lines would violate his stance against abortion; (2) he had recovered from COVID-19 infection and believed the risks of vaccination outweighed the benefits for him; (3) COVID-19 vaccines were in short supply and it would violate his religious beliefs to receive a scarce vaccine before someone else who may receive a greater benefit; and (4) "most importantly" receiving the vaccination would violate his conscience.  (Appx681). Dr. Bushra's exemption request reflected his medical belief that the risks of vaccination outweighed the benefit to him personally, which this Court has held is

not a religious belief subject to Title VII protection.  *Fallon v. Mercy Catholic Med. Ctr.*, 877 F.3d 487, 492 (3d Cir. 2017).

In contrast, the Catholic applicant expressed a single objection to COVID vaccination that she linked to her religious beliefs and practices:

> It is my personal, deeply held religious belief, in the sanctity of human life, at all stages, that causes me to reject the Covid vaccine.  It is my personal belief that it is morally unacceptable for me, personally, to receive a vaccine that any stage of its development or production utilized the fetal cells of aborted babies.  As a practicing Roman Catholic, under the tenets of my faith I am obligated to follow my conscience of matters of sanctity of life.  I come to you with an informed and sure conscience that I should not receive the Covid vaccine.

(Appx835).  Appellant conducted no discovery to confirm that this exemption request was granted and if so, why.  The Religious Exemption Committee made the initial decision to deny Appellant's exemption request, which was affirmed by several levels review.  (Appx718-720).  Appellant did not  depose a single member of the Religious Exemption Committee and therefore did not explore the Committee's analysis of Dr. Bushra's submission or the Catholic individual's exemption request.  Dr. Bushra cannot generate a factual dispute by referencing a single random request to support a disparate treatment claim for which there is no foundation or evidentiary record.[1]  *Mimi Ma v. Westinghouse Elec. Co., LLC*, 559 F.

---

[1] As Appellant did not establish a *prima facie* case of discrimination, the District Court did not address the issue of pretext.  As Dr. Bushra did not conduct any discovery about the decision making by the Committee, and thus he would not have been able to establish that it was motivated by a discriminatory intent or was pretextual in nature.

App'x 165, 171 (3d Cir. 2014)("summary judgment can be avoided only by proffering evidence sufficient to create a material dispute of fact…Forceful insistence on the rightness of one's position does not transform it into evidence.")

Accordingly, the District Court properly rejected Dr. Bushra's disparate treatment claim.

## III. The District Court correctly determined that Appellant failed to establish a retaliation claim.

To succeed on a retaliation claim, Dr. Bushra must prove that: (1) he engaged in activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). The District Court determined that Dr. Bushra could not establish a retaliation claim because he did not engage in "protected activity."

Title VII prohibits two forms of retaliation against employees: (1) where the employee "has opposed any practice made an unlawful employment practice" under the statute; and (2) where the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the statute. *42 U.S.C. § 2000e-3(a)*. Neither sort of activity took place here. Dr. Bushra alleges that he engaged in protected activity when he requested a religious exemption from the COVID Vaccination Policy. As the District Court held, however, "[m]erely applying for a religious accommodation—rather than opposing the allegedly

unlawful denial of a religious accommodation—does not constitute protected activity for the purpose of a Title VII retaliation claim." (Appx015.) In reaching his decision, Judge Bartle referenced the Eighth Circuit's decision in *EEOC v. North Memorial Health Care*, 908 F.3d 1098, 1102 (8th Cir. 2018) that "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation." *See also Divine Equal. Righteous v. Overbrook Sch. for the Blind*, No. CV 23-846, 2023 WL 4763994, at *10 (E.D. Pa. July 26, 2023)(collecting cases). Thus, Dr. Bushra cannot establish a cognizable retaliation claim predicated on his mere request for an exemption from the vaccine mandate.

Appellant contends that "he engaged in protected activity by requesting a religious accommodation from the COVID-19 vaccine requirement" but that "he went beyond that when he appealed the denial and asked for intervention from other entities within Appellee's leadership and decision-makers." (Appellant's Brief at p. 24). Appellant offers no record citation to support his contention that he "asked for intervention from other entities… and decision-makers." Indeed, his retaliation claim is premised on only two allegedly "retaliatory" incidents, both of which predated the denial of his exemption request and therefore were unrelated to his appeal.

First, Appellant says that "Mr. Robinson's visible disdain to Appellant's stated reasoning for requesting accommodation demonstrates retaliatory motive and

a pattern of antagonism by decision makers." (Appellant's Brief at p. 24-25.) Dr. Bushra testified that on September 21, 2021—before the Committee had denied his exemption request-- he told Phil Robinson, the former President of Lankenau Hospital, that he had requested a religious exemption, and that Mr. Robinson "made a face… I've seen him make before when he's disdainful of something and gives it no merit." (Appx 333, 338, 342). Dr. Bushra never shared his exemption request with Mr. Robinson and knew that Mr. Robinson was not involved in reviewing religious exemption requests. (Appx345-346). As Mr. Robinson was not a decision-maker with respect to exemption requests, this alleged incident cannot constitute part of "a pattern of antagonism by decision makers." Moreover, Dr. Bushra may have had access to high-ranking leadership, but the Policy did not contemplate exceptions based on such connections.

The second alleged act of "retaliation" asserted by Dr. Bushra is Main Line Health's "actions to quickly name a replacement." (Appellant's Brief at p. 25). Appellant's citation for this assertion is a truncated portion of an email from Dr. Steven Gamburg, the President of the physician practice MLEMA, of which both Dr. Gamburg and Dr. Bushra are owners, which states:

> MLH administration has requested a meeting ASAP to discuss possible leadership transition at LH [Lankenau Hospital]. I will wait until Thursday but if you do not get an exemption I will need to discuss with your partners at LH the options for going forward.

(Appx683). This September 22, 2021 email, like the September 21, 2021 conversation with Phil Robinson, occurred before the Religious Exemption Committee denied Appellant's exemption request on September 24, 2021 and therefore before he submitted his appeal. (Appx358). Therefore, these interactions are not, as Appellant contends, protected activity related to his appeal.

Moreover, the discussions about a "possible leadership transition," to which Appellant took offense, were reasonable operational considerations. Main Line Health's Chief Medical Officer, Dr. Jonathan Stallkamp, explained that he "had conversations with all of [his] chairs and their chiefs well before COVID about making sure that all of them have backup individuals for every single one of their physicians." (Appx708-709). Dr. Stallkamp stated that he "took it especially to heart after [he] became the interim chief medical officer because … [the] chief medical officer before [him] got sick and then passed away." (Appx709).

An adverse action does not include "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Rather, an individual claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker" from engaging in protected activity. *Id*.

Dr. Bushra's contention that when he told Phil Robinson that he had applied for a religious exemption, Mr. Robinson "made a face," even if true, is exactly what the Supreme Court intended when it stated that "petty slights" and "minor annoyances" are not actionable. Similarly, Main Line Health's consideration of who would replace Dr. Bushra as Campus Chief in the event that his exemption request was denied is reasonable hospital planning, not retaliation, even if Dr. Bushra took offense.

Accordingly, the District Court properly dismissed Dr. Bushra's retaliation claim.

## IV.  CONCLUSION

The District Court properly concluded that Main Line Health established that it would suffer an undue hardship, as defined in *Groff,* if it were required to accommodate Dr. Bushra's objections to COVID vaccination. In addition, Dr. Bushra's hearsay testimony relating to a partially-redacted exemption request of a Roman Catholic individual, does not undermine the undue hardship finding or establish an independent disparate treatment claim. Finally, Dr. Bushra cannot establish a retaliation claim because he did not engage in "protected activity" and did not suffer any actionable retaliation. This Court should affirm the District Court's entry of summary judgment dismissing Appellant's Complaint.

Respectfully submitted,

Brendan Hennessy
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
bhennessy@hennessylawfirm.com
(484) 875-3111
*Of Counsel to Litvin Law Office*
*for Appellee, Main Line Health*

*/s/ Caren Litvin*
Caren Litvin (PA 41796)
Litvin Law Office
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
*Counsel for Appellee, Main Line Health.*

Dated:  April 16, 2024

## COMBINED CERTIFICATIONS

### Certificate of Bar Membership

Pursuant to Local Appellate Rule 28.3(d), I hereby certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated:  April 16, 2024                    By:    */s/Caren Litvin*
                                                          Caren Litvin (ID No. 41796)

### Word Count

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(A) because it does not exceed 30 pages.

Dated:  April 16, 2024                    By:    */s/Caren Litvin*
                                                          Caren Litvin (ID No. 41796)

### Identical Compliance Certification

I certify that the text of the electronic brief and hard copies are identical.

Dated:  April 16, 2024                    By:    */s/Caren Litvin*
                                                          Caren Litvin (ID No. 41796)

### Virus Check

The electronic copy of this Brief has been virus scanned using Intego - Mac Internet Security X9 virus software.

Dated: April 16, 2024                     By:    */s/Caren Litvin*
                                                          Caren Litvin (ID No. 41796)

**CERTIFICATE OF ELECTRONIC SERVICE**

I, Caren Litvin, certify that on April 16, 2024, a true and correct copy of Appellee's Brief was filed electronically and was served electronically upon the following Filing Users through the Court's electronic docketing system:

> David M. Koller, Esq.
> Davidk@phillyhometownlawyer.com
> Jordan Santo, Esq.
> jordans@kollerlawfirm.com
> Koller Law LLC
> 2043 Locust St. #1B
> Philadelphia, PA 19103

Date: April 16, 2024      By: */s/Caren Litvin*
                                   Caren Litvin